## INTER-STATE REFINING & PRODUCING CO. v. WAGGONER.

No. 14853—Opinion Filed Dec., 9, 1924.

### Appeal and Error — Affirmance — Lack of Error.

Where the instructions are conceded to have been correct and fair to both parties and the evidence reasonably tends to support the verdict, the judgment will be affirmed.

(Syllabus by Ray, C.)

Commissioners' Opinion, Division No. 1.

Error from District Court, Tulsa County; W. B. Williams, Judge.

Action by T. E. Waggoner against Inter-State Refining & Producing Company, a corporation. Judgment for plaintiff, and defendant appeals. Affirmed.

Woodard & Westhafer, for plaintiff in error.

M. C. Spradling and Robert J. Boone, for defendant in error.

Opinion by RAY, C. This appeal is from a judgment for a broker's commission in the sale of a refinery by the Inter-State Refining & Producing Company, defendant, plaintiff in error, to the General American Oil Company. The suit was on a written contract between defendant and A. F. Schmidt wherein defendant agreed to pay Schmidt $3,000 to introduce it to parties ready, willing, and able to lease defendant's refinery at Baxter Springs, Kan., on terms to be agreed upon between defendant and the proposed lessee, the $3,000 to be paid when a trade was consummated. After the defendant and the General American Oil Company had been brought together by Schmidt, he assigned all his right, title, and interest in the contract to T. E. Waggoner, who recovered the judgment com-

plained. of. The defendant admits the execution of the contract with Schmidt and no question is raised as to the assignment. The defendant denies that any lease was ever entered into, and denies that the sale of the refinery to the General American Oil Company, about 60 days after the parties were brought together by Schmidt, was the result of Schmidt's introduction, or of his efforts, but says the negotiations as to leasing were broken off and the sale was effected through the efforts of another broker.

The three assignments of error argued by defendant in its brief are, as to the rulings of the court in overruling defendant's demurrer to plaintiff's evidence, in overruling its motion for a directed verdict, and in entering judgment on the verdict of the jury. The first two propositions may be considered together.

Before considering the evidence adduced by the plaintiff, it is necessary to point out certain things that are admitted. It is admitted that by entering into the contract with Schmidt, above referred to, on July 7, 1920, the defendant listed its property to Schmidt as a broker to find a lessee; that the defendant and the General American Oil Company were brought together by Schmidt on the same day the contract was entered into, July 7th, and that on the 15th or 16th day of September, the parties entered into a preliminary contract of sale, and, on the 30th day of September, the General American Oil Company paid to defendant the purchase price of $130,000, and took over the refinery. The question as to whether Schmidt was entitled to his commission by reason of the defendant selling the refinery to the General American Oil Company instead of leasing it, we think, is not before us for consideration. The court instructed the jury that if they believed from a preponderance of the evidence that Schmidt produced the party in the person of the General American Oil Company, who was ready, willing, and financially able to lease the property according to the contract between defendant and Schmidt, and further found from the evidence that negotiations between the defendant and the General American Oil Company, commenced at the time of the introduction, were not broken off and terminated, but that the defendant sold, instead of leasing, the property to the General American Oil Company, their verdict should be for the plaintiff. No exception was reserved to this instruction, and defendant in its brief says that the instructions were equally fair to both plaintiff and defendant and correctly

stated the law; so that the only question open, necessary to be established by plaintiff's evidence, was that Schmidt, acting under his contract brought the parties together, and that as a result thereof negotiations were entered into between the parties which resulted in the sale of the refinery.

As to the matters in dispute, the only witness offered by plaintiff was Schmidt, by deposition. In response to interrogatory No. 7, Mr. Schmidt answered as follows:

"Under this contract I interested the General American Oil Company of Tulsa, Okla., who were in the market for a refinery at this time. I called upon them at their office on the sixth floor of the First National Bank Building, Tulsa, Okla., and interviewed Mr. Philip Kroll, who was the general manager of that company. I made an appointment with him to meet Mr. J. A. Hawkins, the secretary of the Inter-State Refining & Producing Company, the defendant, at Mr. Kroll's office, and then wrote the letter of July 2nd, being exhibit '1' in this cause, and Mr. Hawkins came to my office on July 7th, when the contract, exhibit '2' was executed. I then telephoned Mr. Kroll telling him my party had arrived and that we were on our way over to his office. Mr. Hawkins and I then went to the office of the General American Oil Company where I introduced Mr. Hawkins, the secretary and treasurer of the Inter-State Refining & Producing Company, to Mr. Kroll, general manager of the General American Oil Company, and to Mr. Cornelius Kroll, the president of the General American Oil Company. I had, prior to the last mentioned deal, furnished Mr. Philip Kroll certain data and photographs of the refinery plant of the Inter-State Refining & Producing Company, which I had received from Mr. J. A. Hawkins. At the meeting aforesaid, between Mr. Hawkins and Messrs. Kroll, the details of the refinery were discussed at length, Mr. Kroll saying that if they did take over the refinery they would need more acreage of land than was included in the description of the refinery property, so that they might have room for a cooperage plant and storage of the finished product. Mr. Hawkins answered by saying he could assure them that he could get more land there at a reasonable price, but advised not to let it be known for what purpose it was to be used, for fear of a hold-up price. It was then agreed that Mr. Cornelius Kroll, who was a refinery expert, was to go and personally examine the prospective property. There was discussion as to the manner in which additional tank cars could be obtained on account of their scarcity. Mr. Hawkins and I then left and I walked with him to the railroad station discussing the interview, and I said 'What do you think of our

prospective purchasers' and he said 'It looks to me like they certainly mean business.' We agreed to advise each other of any developments. I received, about July 10th, 1920, the letter of July 9th, 1920, from the General American Oil Company relating to securing an option, and which is exhibit '3MESC' and then I wrote, under date of July 10th, 1920, to Mr. Hawkins a letter, a copy of which is exhibit '4MESC,' to which I received a reply by letter from the Inter-State Refining & Producing Company under date of July 12th, 1920, being exhibit '5MESC,' in which it is stated the terms on which they would give the option, which letter I took over to the General American Oil Company and saw Mr. Philip Kroll, who stated, after being informed of the contents of the letter of July 12th, that they would not pay the option, but would continue their investigation, and I at once wrote Mr. Hawkins the letter of July 12th, being exhibit '6MESC'. I tried by several long distance calls to reach Mr. Hawkins, but from that time on I could not get in touch with him. A few days later I called at the General American Oil Company's office to ascertain what developments had occurred, and could find nothing further except that Mr. Cornelius Kroll was in New York to ascertain if he could get tank cars. Later, say about a week, I saw Mr. Cornelius Kroll on the street in Tulsa, and he informed me that he could get the tank cars and I asked him how the deal was coming along and he said it was only a question of price."

The letters referred to as exhibits show that on July 9th the General American Oil Company wrote Schmidt in reference to their previous interview, in which it was suggested that the proposition for leasing be held open until about the 15th of the next month so that they could go more fully into the matter with their board of directors. That letter was transmitted to the defendant, and on the 12th the defendant wrote Schmidt declining to give an exclusive option for that length of time as they had one other party considering the deal, but that they would be glad to keep in touch with him in case they did not make disposition of the plant.

In response to another interrogatory as to who were present at the time of the first meeting of the parties, and whether a sale or lease of the refinery was discussed, and whether more than one refinery was under consideration, he answered:

"See answer to interrogatory No. 7. Only Mr. Hawkins, Mr. Philip Kroll, Mr. Cornelius Kroll and myself were present. Both a sale and a lease of a refinery was discussed, and all the discussion related to the refinery of Inter-State Refining & Producing Company located at Good Eagle,

Kan., a suburb of Baxter Springs, Kan., and only one refinery, located as aforesaid, was discussed."

The plaintiff testified as to the assignment, and J. A. Hawkins, secretary and treasurer of the defendant company, testified that at the time of these transactions he was secretary and treasurer of the defendant corporation, and that the consideration paid for the refinery by the General American Oil Company was $130,000, and that it was paid the 28th or 29th day of September, 1920.

We think the court properly overruled the demurrer to this evidence. This was sufficient evidence, if uncontroverted, to entitle the plaintiff to recover. The only additional evidence favorable to the plaintiff, at the close of the case, when defendant moved for a directed verdict, was that on the 15th day of July, which was a little more than one week after the contract was entered into and the parties brought together, the officers and managers of the General American Oil Company went to Baxter Springs and inspected the refinery for the purpose of determining whether it would suit their purposes. Evidence was offered on behalf of the defendant tending to show that the General American Oil Company was not in the market for leasing the refinery. Its evidence was directed principally to showing that the negotiations as to the lease of the property were abandoned something like 30 days before negotiations were opened by another broker for the sale of the property. There was some conflict of evidence as to what occurred at the time the parties were brought together, but it is made clear that they were brought together by Schmidt. The evidence is conflicting in many particulars, but there was sufficient evidence to go to the jury, and the court did not err in refusing to direct a verdict for the defendant.

This brings us to a consideration of the other assignment of error argued by plaintiff, that the court erred in entering judgment on the verdict of the jury. This question arises upon a set-off pleaded by defendant. August 25, 1919, the defendant and Schmidt entered into a written contract by the terms of which defendant, in consideration of 28c per barrel, agreed to refine oil to be furnished by Schmidt up to the capacity of its refinery for a period of three years, beginning October 15, 1919, and Schmidt agreed to furnish oil to keep the plant running to its capacity for that period of time. Later, time was extended, by mutual agreement, for Schmidt to begin fur-

nishing oil to October 30, 1919. No oil was ever furnished by Schmidt. November 1, 1919, the next day after Schmidt was to begin furnishing oil to the refinery. the defendant entered into a similar contract with M. F. Shoemaker. In that agreement the defendant agreed to refine oil for Shoemaker up to the capacity of its plant for a period of three years, beginning November 20th of that year, and Shoemaker agreed to furnish oil for that purpose. Shoemaker furnished oil under this contract for a short while when he breached the contract. The defendant brought suit against Shoemaker for his breach of the contract and recovered damages accrued up to and including July 30, 1920. This contract with Shoemaker was pleaded by plaintiff as a novation, and the judgment was pleaded in bar and as an estoppel. The defendant offered evidence to show that the refinery was idle from the 31st day of July, 1919, up until the sale was made September 30, 1920; that the capacity of the plant was 1,000 barrels daily, and that if oil had been furnished to them to the capacity of the refinery, they would have earned a profit of 12c per barrel. The only evidence on the part of the plaintiff tending to contradict the defendant's evidence in support of the set-off was that of Schmidt, in his deposition, in which he stated that neither party ever complied with that contract.

Instruction No. 8 is as follows:

"You are instructed that when cross demands have existed between persons under such circumstances that if one had brought an action against the other a counterclaim or set-off could have been set up, neither can be deprived of the benefit thereof by the assignment of the other; but the two demands must be deemed compensated so far as they equal each other, and in this connection you are instructed that even though you should find that A. F. Schmidt, or his assignee, T. E. Waggoner, the plaintiff in this action, might. under the evidence, be entitled to the commission herein sued for, should you also find from the evidence that the defendant has a set-off against the claim by reason of its claim against A. F. Schmidt under the contract of August 25th, 1919, as set forth in defendant's answer and set-off, you must find for the defendant and deem the two claims compensated in so far as they equal each other."

Instruction No. 9:

"You are instructed that the damage, if any, which defendant is entitled to recover against the plaintiff herein for the alleged breach of contract between A. F. Schmidt and the defendant would be such damage, if any, as the defendant may have sustained between July 31 and September 30, 1920, and the measure of damage, if any, would be the net profit per barrel on the whole number of barrels the defendant could have refined during the period from July 31 to September 30, 1920, inclusive."

It is contended that the verdict, which was for the full amount of plaintiff's claim, was clearly in violation of the law as stated in these instructions, and that the court erred in entering judgment on the verdict. We think this contention cannot be sustained. While the only controverting evidence of the plaintiff was the statement of Schmidt in his deposition that neither party ever complied with the contract, the conduct of the defendant in entering into a similar contract with Shoemaker, by which it agreed to refine oil for him to the full capacity of its refinery for the full period of time covered by Schmidt's contract, was not explained in any particular. The written contract with Schmidt was introduced. The only additional evidence was that defendant put its plant in condition to comply with its contract with Schmidt, and then devoted its plant to complying with a similar contract with Shoemaker as long as he furnished oil; that Schmidt never furnished any oil, and that the plant was idle for the months of August and September, and that if oil had been furnished by Shoemaker or Schmidt to the capacity of the refinery it would have made a profit of 12c a barrel, amounting to more than plaintiff's claim. On this evidence, and the instructions of the court, conceded to have been correct, the jury were justified in concluding, as they appear to have done, that the contract between defendant and Schmidt was mutually abandoned.

The judgment should be affirmed.

By the Court: It is so ordered.

Note.—See 4 C. J. § 3122, 9 C. J. § 127.